IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

EVERGREEN ENGINEERING, INC.,  )    CIVIL NO. 10-00676 LEK-BMK
                           )
        Plaintiff,      )
                           )
     vs.             )
                           )
GREEN ENERGY TEAM LLC,     )
                           )
        Defendant.      )
_____ )

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT/COUNTERCLAIM PLAINTIFF GREEN ENERGY TEAM LLC'S
MOTION FOR PARTIAL SUMMARY JUDGMENT ON (a) COUNT I
(BREACH OF CONTRACT) OF PLAINTIFF EVERGREEN ENGINEERING,
INC.'S FIRST AMENDED COMPLAINT AND (b) COUNT III
(BREACH OF CONTRACT) OF GREEN ENERGY TEAM LLC'S COUNTERCLAIM**

Before the Court is Defendant/Counterclaim Plaintiff Green Energy Team LLC's ("GET") Motion for Partial Summary Judgment on (a) Count I (Breach of Contract) of Plaintiff Evergreen Engineering, Inc.'s First Amended Complaint and (b) Count III (Breach of Contract) of Green Energy Team LLC's Counterclaim ("Motion"), filed on February 29, 2012. [Dkt. no. 51.] Plaintiff/Counterclaim Defendant Evergreen Engineering, Inc. ("Evergreen") filed its memorandum in opposition on April 23, 2012, and GET filed its reply on May 9, 2012. [Dkt. nos. 60, 66.] This matter came on for hearing on June 25, 2012. Appearing on behalf of GET was Thomas E. Bush, Esq., and appearing on behalf of Evergreen were Mark T. Shklov, Esq., and Bennet J. Chin, Esq. After careful consideration of the Motion,

supporting and opposing memoranda, and the arguments of counsel, GET's Motion is HEREBY GRANTED IN PART AND DENIED IN PART for the reasons set forth below.

**BACKGROUND**

## I.   <u>Factual Background</u>

In 2006, GET was formed in the State of Hawaiʻi as a single-member LLC for the purpose of owning and operating a biomass-to-energy plant ("BTE plant") on the Island of Kauai. [Concise Statement of Material Facts in Support of GET's Motion, filed 2/29/12 (dkt. no. 52) ("Def.'s CSOF"), Decl. of Eric Knutzen ("Knutzen Decl.") at ¶ 3.]   GET retained Emery Otruba, an engineer at Steam Plant Systems, Inc. ("SPS"), allegedly to do front-end engineering and conceptual design of a BTE plant with a turbine generator that would be fueled by locally produced wood waste products.   [Def.'s CSOF, Decl. of Brandon M. Segal ("Segal Decl."), Exh. A (excerpts of 1/9/12 Depo. of Emery Mark Otruba ("Otruba Depo.")) at 34-35; Exh. F.]   Otruba and SPS allegedly recommended the use of a gasification/boiler system developed by Chiptec Corporation ("Chiptec").   [Otruba Depo. at 48-50; Def.'s CSOF, Segal Decl., Exh. G at § 1.1.]

In March 2007, the Kauai Island Utility Cooperative ("KIUC") and GET executed a Power Purchase Agreement ("PPA") to build a BTE plant based on the Chiptec wood gasification system. [Def.'s CSOF, Knutzen Decl., Exh. P.]   The PPA contained certain

"milestone dates," and provided that the failure to meet those dates could result in "delay damages" of thousands of dollars per day. [Id. at § 12.4(A).]

Otruba, who had since begun working for Evergreen, and John Solvason, a founding principal of Evergreen, allegedly lobbied GET to hire Evergreen to serve as the managing project engineer for the implementation of the BTE plant project. [Otruba Depo. at 57.]  On or around December 16, 2007, Evergreen and GET entered into an agreement which consisted of the Amended Design Proposal and Attachment "A," including General Conditions for Professional Services (collectively, the "Agreement"). [Def.'s CSOF, Segal Decl., Exh. L (Agreement).]  GET claims that the relevant provision is the "performance guarantee" provision:

> Overall plant performance guarantee will be achieved via guarantees by suppliers of individual equipment and the undertakings of the Contractor and certain project investors as well as by the undertaking of Evergreen in this Agreement.  Equipment performance guarantees will be written into the specifications for each piece of major equipment with financial penalties for performance shortfalls.  Factory performance test combined with on site performance testing will verify that equipment is achieving desired performance.  A highly qualified design team is being proposed for this project with the necessary experience to design and support your project during construction.  The design will be performed in our Eugene, OR office.  Evergreen will work together with your Construction Manager, Contractor and Owner's Representative to ensure that your project is designed and built to the high standards you require in

order to achieve your continual goals.

[Id. at 2.]

In June 2008, the State of Hawai'i Department of Health issued GET a Covered Source Air Permit that contemplated the use of two Chiptec biomass gasifier/boiler systems and was premised on expected usage of 201 tons of fuel per day. [Def.'s CSOF, Knutzen Decl. at ¶ 10; Exh. Q.]  In an agreement between GET and Chiptec, Chiptec guaranteed that GET would not have to use more than 201 tons per day of Albizia and Eucalyptus wood feedstock fuel to operate the BTE plant. [Def.'s CSOF, Segal Decl., Exh. E at 2.]  The parties dispute whether and to what extent Evergreen and GET knew that Chiptec's calculations were incorrect.

In 2009, a review by one of GET's lenders revealed an error in the fuel tonnage calculations for the BTE plant.  In actuality, 240 tons of fuel per day were needed to operate the gasifier system at the required efficiency level. [Def.'s CSOF, Knutzen Decl. at ¶ 15; Otruba Depo. at 128.]  The error allegedly affected GET's calculations regarding: (1) feed stock volume; (2) pro forma financials; (3) economic viability; (4) financing possibilities; and (5) various entitlements such as the covered source air permit. [Def.'s CSOF, Knutzen Decl. at ¶ 16; Segal Decl., Exh. B (excerpts of 1/10/12 Depo. of John Solvason ("Solvason Depo.")) at 133-34.]  GET alleges that, in order to operate the BTE plant in accordance with the air permit, it would

4

have to operate fewer hours or at a lower output than intended under the PPA.  GET had to seek an amendment of the air permit, which has delayed the start date beyond the milestone deadline set forth in the PPA.  [Def.'s CSOF, Knutzen Decl. at ¶ 17.]  GET claims that it was forced to change its business plan and abandon the gasification turbine system, which resulted in the loss of the benefits of the payments it made to Evergreen and other vendors.  [Id. at ¶ 18.]

By the terms of the Agreement, GET was to pay Evergreen's fee of $2,539,342.00 and any reimbursement associated with the scope of services.  [Agreement at 19.]  Evergreen alleges that GET made the first four payments to Evergreen totaling $344,384.49.  [Evergreen's Responsive Concise Statement, filed 4/23/12 (dkt. no. 61) ("Pltf.'s CSOF"), Decl. of John Solvason ("Solvason Decl."), Exh. HH at 1-4.]  Between June 2008 and April 2009, Evergreen sent GET six invoices totaling $139,663.81, but GET only paid $17,979.62.  [Id. at 5-10; Pltf.'s CSOF, Solvason Decl. at ¶ 82.]  Evergreen also states that it billed GET $98,892.73 for additional services outside the scope of the Agreement.  [Pltf.'s CSOF, Solvason Decl., Exh. HH at 11-12.]

Evergreen's First Amended Complaint asserts four causes of action: Breach of Contract (Count I); Further Breach of Contract/Breach of Good Faith and Fair Dealing (Count II);

Quantum Meruit/Unjust Enrichment (Count III); and

Assumpsit/Account Stated (Count IV).  The present Motion seeks

summary judgment as to Count I only.

On December 21, 2010, GET filed its First Amended

Counterclaim against Evergreen, Solvason and Otruba.  [Dkt. no.

22-1.]  It asserts five causes of action: Professional

Malpractice and Negligence (Count I); Negligence Per Se (Count

II); Breach of Contract (Count III); Breach of Express/Implied

Warranty (Count IV); and Unjust Enrichment (Count V).  The

present Motion seeks summary judgment as to Count III only.

## II.  **GET's Motion**

In its Motion, GET argues that, because Evergreen knew

"from day one" that the calculations for fuel consumption were

incorrect and the BTE plant would not work as designed, yet did

not inform GET of these failings, Evergreen breached the

Agreement, and GET is excused from any performance under the

Agreement.  [Mem. in Supp. of Motion at 1-2.]

### A.    **The Agreement Between GET and Evergreen**

GET first argues that the Agreement created a binding

contract between the parties.  [_Id._ at 15 (citing Solvason Depo.

at 38-39).]  GET contends that Evergreen "understood and agreed

that the overall plant performance would be independently

guaranteed by the undertaking of Evergreen and that Evergreen

would ensure that the power plant would work as GET specified."

[Id. at 15-16 (citing Def.'s CSOF, Segal Decl., Exh. K at 2; Agreement at 2-13, 19; Otruba Depo. at 76-77; Solvason Depo. at 37-38).]

B.   **Evergreen's Breach of the Agreement**

GET next argues that, because an architect or engineer must produce an exact result, "the failure to produce the specific result forms the basis of a breach of contract action." [Id. at 16 (citing Tamarac Dev. Co., Inc. v. Delamater, Freund & Assocs., P.A., 675 P.2d 361, 365 (Kan. 1984); Emond v. Tyler Bldg. & Constr. Co., Inc., 438 So.2d 681, 684-85 (La. Ct. App. 1983)).]  It argues that Evergreen guaranteed a specific result: "the overall plant performance that would abide by GET's fuel requirements."  [Id.]  Because Evergreen knew that the Chiptec gasifier system would not work, [id. at 17 (citing Solvason Depo. at 44, 85-86, 92; Otruba Depo. at 84, 103, 143-44),] failed to advise GET of such, and advised GET to obtain a "worthless" performance guarantee from Chiptec, GET contends that Evergreen materially breached its obligations under the Agreement [id. (citing Arkansas Rice Growers Co-op. Ass'n v. Alchemy Indus., Inc., 797 F.2d 565, 566-70 (8th Cir. 1986))].

C.   **GET's Damages from Evergreen's Breach of the Agreement**

GET argues that it suffered significant damages as a result of Evergreen's breach of the Agreement, as the erroneous calculations forced GET to seek an amendment of the air permit,

7

delayed the start of construction, and required GET to radically change its business plan and abandon the gasification/turbine system.  [Id. at 18 (citing Def.'s CSOF, Knutzen Decl. at ¶¶ 16-17).]  GET claims that it lost the benefit of millions of dollars it paid to Evergreen and other vendors, such as the $130,451 deposit to a vendor for a turbine designed to work with the Chiptec gasification system.  [Id. at 18-19 (citing Def.'s CSOF, Knutzen Decl. at ¶¶ 18-19).]

###     D.    **GET's Non-Breach of the Agreement**

Finally, GET contends that, contrary Evergreen's allegations in Count I of the First Amended Complaint, it did not breach the Agreement because its performance was excused by Evergreen's material breach of the Agreement.  [Id. at 19-20 (quoting Mustang Pipeline Co. v. Driver Pipeline Co., 134 S.W.3d 195, 196 (Tex. 2004); 17A Am. Jur. 2d Contracts § 685 (1991)).]

## II.  **Evergreen's Memorandum in Opposition**

###     A.    **Applicable Burden of Persuasion**

Evergreen first argues that GET fails to meet its burden of persuasion because it did not submit expert testimony to establish the requisite standard of care applicable to Evergreen's performance.  [Mem. in Opp. at 7-8.]  In reference to GET's proposition that a professional engineer's failure to produce specific results is the basis of a breach of contract, Evergreen argues that the Agreement was "not for a 'turnkey'

power plant with a contracted-for level of performance," and liability is not dependant upon whether the "exact results" were obtained.  [Id. at 8-9 (citing Frank M. Dorsey & Sons, Inc. v. Frishman, 291 F. Supp. 794 (D.D.C. 1968)).]

Evergreen argues that GET's Motion is not merely based in contract, but also involves tort liability: "[p]rofessional negligence not involving personal injury is often a hybrid of tort and contract."  [Id. at 11 (citing Higa v. Mirikitani, 55 Haw. 167, 517 P.2d 1 (1973)).]  According to Evergreen, because GET argues that Evergreen's performance as a professional engineer fell short of the Agreement's requirements, but does not offer any expert testimony on the standard of care, GET fails to meet its burden of production.  [Id. at 11-12.]

B.   **Breach of Contract**

Evergreen next argues that it did not breach the Agreement.  It first contends that the Agreement does not contain a guarantee or warranty of others' work.  [Id. at 13.]  Under the Agreement's "project approach," the parties agreed that "Evergreen will work directly for GET to prepare a Detailed Design package for bidding to contractors, assist in contractor selection, assist GET with purchasing of long lead major equipment, and provide Design Support during construction." [Agreement at 2.]

9

1.   <u>No Guarantee of Chiptec's Performance</u>

Evergreen argues that, contrary to GET's position that the "guarantee" provided by the Agreement imposed on Evergreen an "independent responsibility for guaranteeing the performance" of the BTE plant, [Mem. in Opp. at 13 (quoting Mem. in Supp. of Motion at 7),] the "guarantee" language is merely a "<u>description</u> of the <u>types</u> of guarantees that will be obtained" [<u>id.</u> at 14 (emphases in original)].  It argues that there were three types of guarantees in the Agreement: "[1] guarantees by suppliers of individual equipment and [2] the undertakings of the Contractor and certain project investors as well as by [3] the undertaking of Evergreen in this Agreement." [<u>Id.</u> (brackets added by Evergreen) (quoting Agreement at 2).]  Evergreen offers five reasons why the Agreement cannot be read as requiring it to guarantee promises of the suppliers.  [<u>Id.</u>]

First, Evergreen argues that, when the term "guarantee" is used in the Agreement to describe a particular party's obligation, "it is limited to 'guarantees by suppliers[,]'" who have "custody and control of their equipment, and are the ones that provide guarantees." [<u>Id.</u>]

Second, Evergreen argues that its work is referred to in the Agreement as "the undertaking of Evergreen in this Agreement."  The "undertakings" are described in the "Scope of Services" section of the Agreement and are "design services,

10

intended to combine the various aspects of previously designed concepts into a unified plan" in the following ways: (1) civil design, [Agreement at 2,] (2) mechanical design, [id. at 6,] (3) woodyard design, [id. at 9,] and (4) plant monitoring and control system design [id. at 11].  [Mem. in Opp. at 14-16.]

Third, Evergreen argues that GET had a longstanding relationship with Chiptec prior to its retention of Evergreen. It alleges that, in 2006, a year before GET hired Evergreen, GET paid Chiptec $80,000 for design services.  [Id. at 16 (citing Pltf.'s CSOF, Decl. of Mark T. Shklov ("Shklov Decl."), Exh. C).]

Fourth, Evergreen argues that GET had previously worked with another engineering firm to prepare most of the original concept plans, including plans for utilization of the Chiptec wood gasification system at the BTE plant.  [Id. at 16-17 (citing Pltf.'s CSOF, Shklov Decl., Exh. D).]

Fifth, Evergreen argues that a guarantee for professional services is highly unusual and should not be implied.  [Id. at 17 (citing Frank M. Dorsey & Sons, Inc. v. Frishman, 291 F. Supp. 794 (D.D.C. 1968)).]  Evergreen states that GET's citation to Arkansas Rice Growers is inapposite, because the holding in that case only applies to Chiptec, the party that made performance guarantees, not Evergreen, the party putting together previously designed components.  [Id. at 18.]

11

2.    **Evergreen's Retention Under a
      Modified Design, Bid, Build Agreement**

Evergreen states that the Agreement was based on a
"modified design, bid, build project delivery method," where "the
owner contracts separately with designers and builders of its
choice, and provides the owner with more flexibility in the
planning, equipping, and construction of the project."  [Id. at
18-19 (citing Associated Subcontractors of Mass., Inc. v. Univ.
of Mass. Bldg. Auth., 442 Mass. 159, 810 N.E.2d 1214, 1219 n.8
(2004)).]  It argues that the Agreement was not a "design build
contract" or "engineer, procure, construct contract" that would
include a promise to deliver a "turnkey plant or other project
for a fixed sum."  [Id. at 20.]

Rather, Evergreen states that, by August 2007, the
parties were focused on entering into a design, bid, build
project contract.  It argues that the lenders' attorneys called
attention to the fact that the contract was not an engineer,
procure, construct contract and that Evergreen's proposal and the
construction proposal did not contain performance guarantees or
performance liquidated damages.  [Id. at 21 (quoting Pltf.'s
CSOF, Shklov Decl., Exh. H at 1, 4).]  Evergreen contends that it
was not retained to design or construct a turnkey power plant
with specific performance characteristics.  [Id. at 22.]

C. **GET's Claim of Evergreen's Breach**
   **Unsupported by the Objective Evidence**

Evergreen claims that GET's criticism of its work is a
recent phenomenon, as it had previously been pleased with
Evergreen's work.  [Id. (quoting Pltf.'s CSOF, Decl. of Emery M.
Otruba ("Otruba Decl."), Exh. DD).]  Then, around the time GET
partnered with German company Standardkessel Baumgarte
Contracting GmbH in or around January 2011, Evergreen claims that
GET "began to 'discover' shortcoming that allegedly excused its
duty to pay its debts."  [Id.]  Evergreen contends that "GET's
alleged defenses and counterclaims are being used in an attempt
to have Evergreen bear the cost of GET's fully-informed business
decisions."  [Id. at 23.]

Evergreen argues that it had warned GET about the
problems with Chiptec's fuel calculations.  It points to
correspondence in 2007 between GET, Chiptec, and Evergreen, in
which GET questioned Chiptec's calculations regarding fuel usage
estimates.  GET then sought advice from Otruba, stating: "This is
a catastrophe if we this late in the day work with a higher fuel
volume than 195 tons per day at 40% mc [moisture content].  Pls
help me understand this[.]"  [Id. at 24 (quoting Pltf.'s CSOF,
Otruba Decl., Exh. I).]  Otruba purportedly responded by
"point[ing] out that the conceptual designs produced by
SPS/Chiptec had previously indicated 195 tons fuel usage per day
('TPD') at a 30% MC content."  [Id. at 25 (citing Pltf.'s CSOF,

13

Otruba Decl., Exh. J).]  Evergreen argues that, by an e-mail
dated December 19, 2007, Evergreen explicitly warned GET about
Chiptec's numbers, stating, "we think that the currently proposed
ESP is too small and the wood consumption rate will be much
higher." [Id. at 28 (quoting Pltf.'s CSOF, Solvason Decl., Exh.
N).]

Evergreen next argues that GET did not treat the
likelihood of increased fuel consumption as a constraining factor
or "show stopper." [Id. at 29.]  First, it points to the Chiptec
Agreement signed by GET in April 2008, which was not based on 195
tons per day, but rather allowed for up to 220.8 tons per day.
[Id. at 30 (citing Pltf.'s CSOF, Solvason Decl., Exh. V at 2;
Shklov Decl., Exh. C; Otruba Decl. at ¶¶ 62-63).]  Second, GET
secured additional fuel supply through an agreement with Hawaiian
Mahogany, Inc. in 2006 "in the total amount of 200 tons per day
at 40% moisture content." [Id. (quoting Pltf.'s CSOF, Shklov
Decl., Exh. O at 1).]  Third, Evergreen claims that GET spoke of
additional fuel sources. [Id. at 30-31 (citing Pltf.'s CSOF,
Otruba Decl., Exhs. T, U).]  Evergreen further notes that the PPA
did not reference the tons-per-day requirement, nor was Chiptec's
performance guarantee based on such requirement. [Id. at 31
(citing Def.'s CSOF, Knutzen Decl., Exh. P; Pltf.'s CSOF, Otruba
Decl., Exh. V).]  Evergreen contends that, contrary to GET's
argument that Evergreen's failure to advise it about the fuel

14

requirements affected its financials, financing possibilities, air permit, and economic viability, Evergreen advised GET that the fuel numbers were too low, yet GET proceeded despite the known risk.  [Id.]

Evergreen further argues that GET did not want it investigating the fuel supply.  Evergreen points to an e-mail it sent to one of GET's consultants in December 2007, wherein it stated: "The one main question is 'Will there be enough wood (Albizia) to supply the boilers?'  It looks like they will need 200 to 300 TPD depending on the moisture."  [Id. at 32 (quoting Pltf.'s CSOF, Solvason Decl., Exh. Q).]  GET responded by telling Evergreen that the feedstock needs have already been investigated and to not incur additional costs in making such inquiries.  [Id. (quoting Pltf.'s CSOF, Solvason Decl., Exh. Q).]

### D.   **GET's Lenders' Lack of Support for Chiptec**

Evergreen argues that GET's lenders' lack of support for Chiptec was a superseding event that undermines GET's effort to blame Evergreen for its own uninformed choices.  It points to an e-mail dated September 1, 2008, in which GET informed Evergreen that its lenders were "not showing support to proceed with Chiptec."  [Id. (quoting Pltf.'s CSOF, Otruba Decl., Exh. W).]

### E.   **Retention of Luminate by GET to Provide an Independent Review**

Evergreen states that GET retained Luminate to conduct an independent review of the design of the project, including the

Chiptec fuel data.  It cites to a demand letter sent by GET to Luminate, in which GET states: "To insure the commercial viability of its project, GET engaged Luminate to perform an independent review of the proposed design of the project and the equipment specified to be purchased.  In its review, Luminate failed to identify the serious error made by CHIPTEC . . . ." [Id. at 34 (Evergreen's emphasis omitted) (quoting Pltf.'s CSOF, Shklov Decl., Exh. X).]

F.   **Selection of Chiptec and its System**

Evergreen argues that GET's sole member, Green Energy Hawaii, LLC, selected Chiptec years before Evergreen and GET executed the Agreement, and "[i]t is unreasonable to believe that Evergreen was retained to guaranty [sic] Chiptec's performance representations under the circumstances."  [Id.]  For example, GET worked with SPS, which memorialized the project understanding as follows: "The plant will utilize the Chiptec wood gasification system and burn local Abizia [sic] wood.  Chiptec will provide the material handling system, gasification system and the steam boilers, purchased directly by the owner, GEH.  Chiptec will also provide Conceptual Design services in parallel with the SPS[.]" [Id. at 36 (Evergreen's emphasis omitted) (quoting Pltf.'s CSOF, Shklov Decl., Exh. D).]

Evergreen claims that, in July 2007, e-mails indicate that GET had decided to utilize Chiptec gasifier and would "no

16

longer host the idea of using any other gasifier other than Chiptec's." [Id. at 37 (Evergreen's emphasis omitted) (quoting Pltf.'s CSOF, Shklov Decl., Exh. BB).]  By the time Evergreen was actually retained, GET had allegedly spent over three years developing an integrated plan based on the use of Chiptec gasifier.  [Id. at 36-37.]

### G.   GET's Damages

Evergreen claims that GET has not suffered any damage, because GET settled with Chiptec and could have mitigated its losses.  [Id. at 40 (citing Pltf.'s CSOF, Shklov Decl., Exh. CC).]  Evergreen argues that "GET elected to enforce the system performance guarantees, and it has been compensated in the manner it had contractually agreed upon - through the performance guarantees."  [Id.]

### H.   GET's Breach of the Agreement

Finally, Evergreen argues that GET breached the Agreement.  It asserts that it provided services under the Agreement, and, although GET paid the first few invoices, it failed to pay over $230,000 for Evergreen's services.  [Id. at 40-41 (citing Pltf.'s CSOF, Solvason Decl. at ¶¶ 68-97; Exh. HH).]  Evergreen also claims that it is entitled to lost profits. [Id. at 42.]

17

III. **GET's Reply**

   A.   **Evergreen's Guarantee of Overall Plant Performance**

        GET argues that Evergreen guaranteed the overall plant performance in the Agreement, and Evergreen's arguments to the contrary fail to create an issue of material fact.  [Reply at 2.]

        First, GET argues that Evergreen fails to "create an ambiguity by parsing out the otherwise unambiguous language in piece-meal format[.]"  [Id. at 4.]  GET states that the "'terms of a contract should be interpreted according to their plain, ordinary and accepted use in common speech, unless the contract indicates a different meaning.'"  [Id. at 4-5 (quoting Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 108, 839 P.2d 10, 24 (1992)).]  It argues that there is nothing ambiguous in the guarantee language, as the only reasonable interpretation is that "the 'overall plant performance guarantee' will be independently achieved by 'the undertaking of Evergreen[.]'"  [Id. at 4 (quoting Agreement at 2).]  Evergreen allegedly promised in the Agreement to "ensure that your project is designed and built to the high standards you require in order to achieve your continual goals."  [Id. at 5 (GET's emphases omitted) (quoting Agreement at 2).]  The "undertakings" allegedly require Evergreen to review the previously developed concepts and further develop them.  [Id. (citing Agreement at 2, 6, 9, 11).]  GET contends that the four corners of the document indicate that

18

Evergreen "independently promised to ensure the plant would perform as designed." [Id.]

Second, GET argues that the Court should disregard pages 16-22 of Evergreen's memorandum in opposition, because Evergreen's attempt to introduce extrinsic evidence regarding the interpretation of the plain language of the Agreement violates the parole evidence rule. [Id. at 6 (quoting Wittig v. Allianz, A.G., 112 Hawai'i 195, 201, 145 P.3d 738, 744 (Ct. App. 2006)).] GET argues that, even if the Court were to consider Evergreen's arguments, none of them create issues of material fact. [Id.] Regarding Evergreen's argument that a November 15, 2007 Letter from Baker & McKenzie LLP shows that Evergreen's proposal and the construction proposal did not contain performance guarantees or performance liquidated damages, GET argues that this letter refers to an earlier version of the proposal that did not contain the guarantee language. Rather, the language was later inserted for the purpose of "'strengthen[ing] Evergreen's liability obligations.'" [Id. at 6-7 (quoting Def.'s CSOF, Segal Decl., Exh. K).] Regarding Evergreen's argument that, because the Agreement was a "'modified design, bid, build project delivery method'" and not a "'traditional engineer, procure, construct contract,'" Evergreen was not obligated to furnish GET with a "turnkey" plant, GET argues that Evergreen fails to set forth any evidence indicating that the parties intended to absolve

19

Evergreen of liability for the overall plant performance. [Id. at 7.] Regarding Evergreen's argument that GET's selection of the Chiptec boiler absolved it of liability for overall plant performance, GET contends that these facts are irrelevant and nonsensical because Evergreen was hired to ensure that the chosen design would work. [Id. at 8.]

Third, GET argues that Evergreen largely ignored the Eighth Circuit's opinion in Arkansas Rice Growers because it is directly on point and found that the engineering consultant was obligated under the contract to provide overall oversight of construction designs in order to achieve a specific performance result. [Id.]

**B.** **Evergreen's Alleged Warnings to GET**

Next, GET argues that Evergreen did not inform GET that the BTE plant would not perform as specified. Although Evergreen said that Chiptec's numbers were possibly wrong, it never told GET that the project would not work as specified and never told GET that obtaining a performance guarantee from Chiptec was futile. GET claims that, by telling GET to get a guarantee from Chiptec, Evergreen misled GET about the viability of the Chiptec boiler design. [Id. at 9-10.]

**C.** **Further "Evidence" Submitted by Evergreen**

GET contends that the other "evidence" submitted by Evergreen is irrelevant to a determination of the present Motion

and does not raise a genuine issue of material fact.

First, as to the alleged need for an expert opinion, GET argues that Evergreen is plainly mistaken because GET only moved for partial summary judgment on the breach of contract claims, not on claims for professional malpractice and negligence.  The cases cited by Evergreen are inapposite because the present case involves specific contractual language through which Evergreen independently guaranteed overall plant performance.  [Id. at 11-12.]

Second, GET claims that Evergreen's discussion regarding fuel consumption as a "show stopper" is irrelevant. GET states that "Evergreen focuses on (and misrepresents) the fact that GET allegedly had access to more fuel supply," and claims that the Hawaiian Mahogany agreement is outdated and irrelevant.  [Id. at 12.]  GET notes that the only fact relevant to Evergreen's liability is that "Evergreen does not dispute that the amount of fuel contemplated to be used with the Chiptec boiler pursuant to the April 2008 Chiptec Agreement was significantly less than the amount of fuel that was actually needed to operate the biomass plan pursuant to GET's specifications."  [Id. at 13.]

Third, GET argues that its lenders' lack of support for Chiptec does not absolve Evergreen of its contractual obligations to ensure the performance of the BTE plant.  GET also argues that

Evergreen does not explain why Luminate's failure to catch the Chiptec error is significant or relevant to the Motion. [Id.]

Fourth, GET argues that the Agreement contemplates that the woodyard design is based solely on information provided by Chiptec, but this fact does not absolve Evergreen of its obligation to ensure overall plant performance. [Id. at 13-14.]

Finally, as to Evergreen's damages argument, GET argues that Evergreen's conclusory allegation that GET could have mitigated its losses is not supported by any evidence. It states that the turbine payments are only a small portion of its total damages, which is not the subject of this Motion and which will be proven at trial. It also states that the amount of settlement funds received from Chiptec is irrelevant as to whether GET was damaged by Evergreen's breach. [Id. at 14.] GET requests that the Court grant summary judgment in its favor on the breach of contract claims.

## STANDARD

The standard for summary judgment is well known to the parties and the Court and does not bear repeating here. See, e.g., Rodriguez v. Gen. Dynamics Armament & Technical Prods., Inc., 696 F. Supp. 2d 1163, 1176 (D. Hawai'i 2010).

## DISCUSSION

### I. General Principles of Contract Interpretation

The Motion focuses exclusively on the relevant claims

22

for breach of contract.  Under Hawai'i law, a contract "requires an offer and acceptance, consideration, and parties who have the capacity and authority to agree as they do."  In re Doe, 90 Hawai'i 200, 208, 978 P.2d 166, 174 (1999) (quoting Dowsett v. Cashman, 2 Haw. App. 77, 83, 625 P.2d 1064, 1068 (1981)).  In addition, "'[t]here must be mutual assent or a meeting of the minds on all essential elements or terms in order to form a binding contract.'"  Carson v. Saito, 53 Haw. 178, 182, 489 P.2d 636, 638 (1971) (quoting Honolulu Rapid Transit Co. v. Paschoal, 51 Haw. 19, 26-27, 449 P.2d 123, 127 (1968)).  To prevail on a claim for breach of contract, a party must prove: "(1) the contract at issue; (2) the parties to the contract; (3) whether Plaintiff performed under the contract; (4) the particular provision of the contract allegedly violated by Defendants; and (5) when and how Defendants allegedly breached the contract." Honold v. Deutsche Bank Nat'l Trust Co., Civ. No. 10-00625 JMS/BMK, 2010 WL 5174383, at *3 (D. Hawai'i Dec. 15, 2010) (citing Otani v. State Farm Fire & Cas. Co., 927 F. Supp. 1330, 1335 (D. Hawai'i 1996) ("In breach of contract actions, . . . the complaint must, at minimum, cite the contractual provision allegedly violated.  Generalized allegations of a contractual breach are not sufficient.")).

        The Hawai'i Supreme Court has stated that, "[a]s a general rule, the construction and legal effect to be given a

23

contract is a question of law." <u>Koga Eng'g & Constr., Inc. v. State</u>, 122 Hawai'i 60, 72, 222 P.3d 979, 991 (2010) (citations omitted).  "[A]bsent an ambiguity, [the] contract terms should be interpreted according to their plain, ordinary, and accepted sense in common speech." <u>Id.</u> (some alterations in <u>Koga</u>) (quoting <u>Found. Int'l, Inc. v. E.T. Ige Constr., Inc.</u>, 102 Hawai'i 487, 495, 78 P.3d 23, 31 (2003)).  When interpreting a contractual provision, the court's goal is to determine the intention of the parties.  <u>Pancakes of Hawaii, Inc. v. Pomare Props. Corp.</u>, 85 Hawai'i 300, 304-05, 944 P.2d 97, 101-02 (Ct. App. 1997).  "When the terms of a contract are definite and unambiguous there is no room for interpretation." <u>Hanagami v. China Airlines, Ltd.</u>, 67 Haw. 357, 364, 688 P.2d 1139, 1144 (1984) (quoting <u>H. Hackfield and Co. v. Grossman</u>, 13 Haw. 725, 729 (1902)).  If the parties use language that "leaves some doubt as to the meaning and intention[,]" however, then the court will "apply the rules of construction and interpretation in an effort to ascertain the intention of the parties to the contract." <u>Id.</u>

Regarding contract ambiguities, the Hawai'i Intermediate Court of Appeal has stated:

> Where the terms of a contract are ambiguous, the ambiguity raises the question of the parties' intent, which is a question of fact that will often render summary judgment inappropriate. <u>Found. Int'l, Inc. v. E.T. Ige Construction, Inc.</u>, 102 Hawai'i 487, 497, 78 P.3d 23, 33 (2003); <u>Hanagami v. China Airlines, Ltd.</u>, 67 Haw. 357, 364, 688 P.2d

1139, 1145 (1984).  If the language of a
contract is unambiguous, however, the
interpretation of the contract presents a
question of law to be decided by the court.
Found. Int'l, Inc., 102 Hawai'i at 497, 78
P.3d at 33; United States v. 0.35 Of An Acre
Of Land, 706 F. Supp. 1064, 1070 (S.D.N.Y.
1988).

In addition, the determination of
whether a contract contains ambiguous terms
is a threshold question of law for the court
to decide.  Found. Int'l, Inc., 102 Hawai'i
at 496, 78 P.3d at 32; 0.35 Of An Acre Of
Land, 706 F. Supp. at 1070.  A contract term
or phrase is ambiguous only if it is capable
of being reasonably understood in more than
one way.  Cho Mark Oriental Food, Ltd. v. K &
K Int'l, 73 Haw. 509, 520, 836 P.2d 1057,
1063-64 (1992).  The parties' disagreement
over the meaning of a contract's terms does
not render clear language ambiguous.  Found.
Int'l, Inc., 102 Hawai'i at 497, 78 P.3d at
33.  "Nor does ambiguity exist where one
party's view strains the contract language
beyond its reasonable and ordinary meaning."
Seiden Assocs., Inc. v. ANC Holdings, Inc.,
959 F.2d 425, 428 (2d Cir. 1992) (quotation
marks and brackets omitted).  Under the parol
evidence rule, the court may not resort to
extrinsic evidence to determine the parties'
intent where the contract's language is
unambiguous.  Amfac, Inc. v. Waikiki
Beachcomber Inv. Co., 74 Haw. 85, 124-25, 839
P.2d 10, 31 (1992).

Wittig v. Allianz, A.G., 112 Hawai'i 195, 201-02, 145 P.3d 738,

744-45 (Ct. App. 2006); see also State Farm Fire & Cas. Co. v.

Pac. Rent-All, Inc., 90 Hawai'i 315, 324, 978 P.2d 753, 762

(1999) ("courts should not draw inferences from a contract

regarding the parties' intent when the contract is definite and

unambiguous.  In fact, contractual terms should be interpreted

according to their plain, ordinary meaning and accepted use in common speech.  The court should look no further than the four corners of the document to determine whether an ambiguity exists").

## II.  <u>Ambiguity of the Agreement</u>

Before considering whether Evergreen breached the Agreement, the Court must first determine, as a threshold matter, whether the Agreement is ambiguous with regard to Evergreen's obligations under the "guarantee" language of the Agreement.  The Court "look[s] no further than the four corners of the document to determine whether an ambiguity exists." <u>Pac. Rent-All, Inc.</u>, 90 Hawai'i at 324, 978 P.2d at 762.

Neither GET nor Evergreen directly discusses whether the "guarantee" provision is ambiguous.  Although Evergreen does not explicitly argue that the guarantee provision at issue is ambiguous, the Court construes its argument the "guarantee" language in the Agreement was not a guarantee or warranty of the performance of others to assert contractual ambiguity.  [Mem. in Opp. at 12-17.]  Evergreen asserts that the "guarantee" is limited to "guarantees by supplier," while its obligations are confined to the "undertakings" enumerated in the Agreement's "Scope of Services." [<u>Id.</u> at 14-16.]

In its Motion, GET affords little attention to whether the alleged guarantee is free of ambiguity, instead arguing in

cursory fashion that "Evergreen expressly understood and agreed
that the overall plant performance would be independently
guaranteed by the undertaking of Evergreen and that Evergreen
would ensure that the power plant would work as GET specified."
[Mem. in Supp. of Motion at 15-16 (citations omitted).]  The
authorities cited in support of this proposition, however, only
generally speak to Evergreen's acceptance of the terms of the
Agreement, not to Evergreen's express understanding of its
obligation under the Agreement regarding the alleged guarantee.
[Id. at 16 (citing Agreement at 2; Otruba Depo. at 77
(acknowledging that Evergreen agreed to the terms of the
Agreement at issue); Solvason Depo. at 37-38 (same); Def.'s CSOF,
Segal Decl., Exh. K at 2-13, 19).]  In its reply memorandum, GET
responds to Evergreen's arguments by taking the position that the
guarantee language is unambiguous, because "[t]he only reasonable
interpretation of the [guarantee] clause is that the 'overall
plant performance guarantee' will be independently achieved by
'the undertaking of Evergreen[.]'"  [Reply at 4 (quoting
Agreement at 2).]

The Court agrees, in part, with Evergreen regarding its
argument that the Agreement is ambiguous.  The relevant language
of the Agreement provides that the "[o]verall plant performance
guarantee will be achieved via guarantees by suppliers of
individual equipment and the undertakings of the Contractor and

27

certain project investors as well as by the undertaking of

Evergreen in this Agreement." [Agreement at 2.]  That same

paragraph provides that "Evergreen will work together with your

Construction Manager, Contractor and Owner's Representative to

ensure that your project is designed and built to the high

standards you require in order to achieve your continual goals."

[Id.]  On the one hand, the Court is sympathetic to GET's

position that this provision explicitly uses the term

"guarantee," when such term was not required.  The Hawai'i

Supreme Court has stated:

> We have long expressed our disapproval of
> interpreting a contract such that any
> provision be rendered meaningless.  See Reed
> & Martin, Inc. v. City & County of Honolulu,
> 50 Haw. 347, 349, 440 P.2d 526, 528 (1968)
> (interpreting contract so as not to render a
> clause of the contract meaningless); Richards
> v. Ontai, 19 Haw. 451, 453-54 (1909)
> (construing terms of lease so as not to
> render a clause of the lease meaningless).
> See also Restatement (Second) of Contracts
> § 203 ("[A]n interpretation which gives a
> reasonable, lawful, and effective meaning to
> all the terms is preferred to an
> interpretation which leaves a part
> unreasonable, unlawful, or of no effect[.]");
> Candlelight Props., LLC v. MHC Operating Ltd.
> P'ship, 750 N.E.2d 1, 17 (Ind. Ct. App. 2001)
> (explaining that in interpreting the rights
> and duties under a promissory note and a
> mortgage, the court "make[s] all attempts to
> construe the language in a contract so as not
> to render any words, phrases, or terms
> ineffective or meaningless").  While SCD's
> interpretation would render either the word
> "claim" or the word "right" superfluous,
> UH/HL's interpretation would give effect to
> both words.  Thus, the circuit court did not

28

> err in ruling that the Agreement encompasses "claims" asserted by SCD and not merely "claims of offset."

Stanford Carr Dev. Corp. v. Unity House, Inc., 111 Hawai'i 286, 297-98, 141 P.3d 459, 470-71 (2006) (alterations in Stanford Carr).

Pursuant to the general rules of construction, the Court can surmise that, as memorialized in the Agreement, Evergreen agreed that its "undertaking," along with the "guarantees by suppliers . . . and the undertakings of the Contractor and certain project investors," would "achieve" the overall plant performance guarantee. [Agreement at 2.] "Guarantee" is defined as an "assurance that a contract or legal act will be duly carried out." Black's Law Dictionary 772 (9th ed. 2009). The Court concludes that, by including the term "[o]verall plant performance guarantee," the Agreement memorialized Evergreen's "assurance" regarding overall plant performance.

On the other hand, the Agreement is not so clear as to explain the scope of the guarantee or assurance or the specific contours of "overall plant performance." The provisions of the Agreement cited by Evergreen, [Mem. in Opp. at 14-16 (quoting Agreement at 2, 6, 9, 11),] describe the scope of some of the services to be provided by Evergreen, but the Court cannot say

that these services either include or exclude a guarantee of
performance.  In fact, the Court is unable to discern at all what
the guarantee applies to.  The Court thus concludes that an
ambiguity exists regarding the guarantee provided by Evergreen.

Moreover, the Court does not hold, as a matter of law,
that, by virtue of entering into an agreement for services,
Evergreen is automatically obligated to produce a "turnkey" BTE
plant.  GET cites to Tamarac Development Co. v. Delamater,
Freund, & Associates, P.A., 234 Kan. 618 (1984), in which the
Supreme Court of Kansas held that, under Kansas law, a person may
contract with professionals for an exact result.  That court held
that a professional such as an architect or engineer may
guarantee their work for an exact result:

> Based on our decision in Malone v. University
> of Kansas Medical Center, 220 Kan. 371, 552
> P.2d 885, it can be said certain
> professionals, such as doctors and lawyers,
> are not subject to such an implied warranty.
> However, an architect and an engineer stand
> in much different posture as to insuring a
> given result than does a doctor or lawyer.
> The work performed by architects and
> engineers is an exact science; that performed
> by doctors and lawyers is not.  A person who
> contracts with an architect or engineer for a
> building of a certain size and elevation has
> a right to expect an exact result.  See Hanna
> v. Huer, Johns, Neel, Rivers & Webb, 233 Kan.
> 206, 662 P.2d 243 (1983).

Id. at 622.

GET also cites to the Eighth Circuit's decision in
Arkansas Rice Growers Cooperative Ass'n v. Alchemy Industries,

30

Inc., 797 F.2d 565 (8th Cir. 1986), as an analogous case in which the court held that the operator of a rice hull processing plant was entitled to recover against the engineer/developer of the process and rights-holder of the process when the plant failed to achieve the necessary performance criteria.  In that case, the rights-holder and engineer entered into a contract with the operator for the construction of a factory that would burn rice hulls and create lucrative ash byproduct.  The operator constructed the facility based on the engineer's design, but the plant never performed as anticipated and was repeatedly shut down because of a build-up of hulls in the furnace and an inability to comply with state air pollution control standards.  Id. at 566-67.

The operator filed suit against the engineer and rights-holder for breach of contract and negligent design. The Eighth Circuit affirmed the district court's decision that the engineer and rights-holder were obligated to produce an operational plant, holding that:

> the district court did not err in placing
> liability on [rights-holder] and [engineer]
> for the failure of the plant to operate as
> anticipated by the parties.  The construction
> contract obligated [rights-holder] and
> [engineer] to provide "the necessary
> engineering plant layout and equipment design
> and the onsite engineering supervision and
> start up engineering services" for the
> construction of a hull-burning plant capable
> of achieving the performance criteria.
> [Rights-holder] and [engineer] thus warranted

31

> that a plant constructed according to [engineer's] design was capable of achieving the performance criteria.  See <u>United States v. Spearin</u>, 248 U.S. 132, 137, 39 S. Ct. 59, 61, 63 L. Ed. 166 (1918) (a party who furnishes plans and specifications warrants their sufficiency for the purpose in view); <u>Centex Construction Co. v. James</u>, 374 F.2d 921, 924 (8th Cir. 1967).  The evidence is undisputed that the plant was never capable of achieving the performance criteria on a sustained basis.  The district court found, and we agree, that the primary reason the plant could not perform as anticipated was that the furnace system designed by [engineer] could not perform properly when the outside temperature was less than fifty degrees.

<u>Id.</u> at 569.

Conversely, Evergreen cites to <u>Frank M. Dorsey & Sons, Inc. v. Frishman</u>, 291 F. Supp. 794 (D.D.C. 1968), for the proposition that a professional such as an architect or engineer, like a doctor or lawyer, is not liable for a specific result. Applying the law of the District of Columbia, that court said:

> This brings us to the question what rule should be applied to the liability of an architect or an engineer to his principal.  A professional man is not a guarantor of his work.  For example, a physician is not liable for damages if he fails to cure his patient. A lawyer is not liable for damages if he fails to win his case.  A professional man is under an obligation to use due care and also to comply with the standards prevailing in his area and followed by other members of the same profession in the same specialty.  In other words, he is liable only for negligence.
>
>         . . . .

No reason is perceived why the same principle should not apply to members of other professions, such as engineers and architects. The Court is of the opinion that an engineer or architect should be held liable only for negligence, that is a lack of due care or failure to comply with the standards generally prevailing in his craft or profession in the area in which he practices.

291 F. Supp. at 796.

The parties have not pointed the Court to any Hawai'i case law addressing this exact issue, and the Court was not able to locate any such authority. In the absence of specific contractual language obligating Evergreen to produce a "turnkey" BTE plant, the Court is hesitant to imply such a requirement into the Agreement, solely on the basis that Evergreen is an engineering firm. The cases cited by the parties are instructive, but, ultimately, not binding on this Court, and the Court does not adopt either party's position. The Court therefore declines to imply a "turnkey" guarantee and determines that the Agreement is ambiguous as to the extent of the guarantee.

Thus, it is clear that Evergreen provided a guarantee to GET regarding some aspect of the development and implementation of the BTE plant, but it is unclear precisely *what* Evergreen agreed to guarantee. Accordingly, although the Court FINDS that Evergreen guaranteed *something*, the Court FINDS an ambiguity regarding the subject and scope of the "guarantee."

33

## III. **Genuine Disputes of Material Fact**

Given the Court's conclusion that the "guarantee" provision in the Agreement is ambiguous, the Court must now conduct a "further inquiry to determine the intention of the parties." See Maui Land & Pineapple Co. v. Dillingham Corp., 67 Haw. 4, 11, 674 P.2d 390, 395 (1984). "The intent of the parties is a question of fact, and '[i]nasmuch as the determination of someone's state of mind usually entails the drawing of factual inferences as to which reasonable men might differ, summary judgment often will be an inappropriate means of resolving an issue of that character.'" Hanagami, 67 Haw. at 364, 688 P.2d at 1145 (quoting Bishop Trust Co. v. Central Union Church, 3 Haw. App. 624, 628-29, 656 P.2d 1353, 1356 (1983)). The Court thus considers whether a genuine dispute of material fact exits with regard to GET's and Evergreen's intent regarding the Agreement's "guarantee."

Evergreen puts forth a number of factual arguments in support of its position that the Agreement did not provide a guarantee of the BTE plant's performance: (1) GET's prior relationship with Chiptec; (2) SPS's preparation of the original concept plans; (3) comments by GET's lenders' attorneys regarding Evergreen's proposal; and (4) factory performance testing.  [Mem. in Opp. 16-22.]  GET does not offer any factual evidence of the parties' intent.

34

The Court concludes that there are genuine disputes of material fact as to the parties' intent.  Neither party provides the Court with evidence with which it could determine the parties' intent regarding the nature and scope of Evergreen's guarantee, and the arguments put forth by Evergreen are unpersuasive.  Regarding Chiptec's and SPS's roles in the development of plans for the BTE plant, the Court finds that these entities' participation does not evidence the parties' intent concerning Evergreen's guarantee.  Regarding comments by the lenders' attorneys, it appears as though the letter may reference a version of the Agreement that did not include the "guarantee" language.  [Pltf.'s CSOF, Shklov Decl., Exh. H; Def.'s CSOF, Segal Decl., Exh. K; Reply at 6-7.]  Relatedly, Evergreen provides no other factual basis for its assertion that, even assuming that the Agreement utilizes a "modified design, bid, build project delivery method," the Agreement precludes a guarantee by Evergreen of its work.  Finally, regarding the factory testing provision, Evergreen presents no authority that this provision would necessarily preclude Evergreen's guarantee.  Accordingly, the Court cannot say, as a matter of law, that the parties did or did not intend for Evergreen to guarantee the performance of the BTE plant, and this question is better left to the trier of fact.  To the extent that the Court FINDS that there is a genuine dispute of material fact regarding the intent of the

parties regarding the scope and nature of Evergreen's guarantee, the Motion is DENIED.

Because there is a genuine dispute of material fact regarding the terms of the Agreement, the Court does not reach the gravamen of the Motion: whether Evergreen breached the Agreement and, consequently, whether GET's performance is excused by Evergreen's alleged non-performance.  Accordingly, the Court does not address and takes no position on the parties' arguments regarding the alleged breach of the Agreement.

<u>CONCLUSION</u>

On the basis of the foregoing, GET's Motion for Partial Summary Judgment on (a) Count I (Breach of Contract) of Plaintiff Evergreen Engineering, Inc.'s First Amended Complaint and (b) Count III (Breach of Contract) of Green Energy Team LLC's Counterclaim, filed March 1, 2012, is HEREBY GRANTED IN PART DENIED AND DENIED IN PART.  The Motion is GRANTED insofar as the Court FINDS that Evergreen provided GET with a "guarantee." Because the Court is unable to determine the subject or scope of that guarantee, the Court FINDS an ambiguity in the Agreement and thus DENIES the remainder of the Motion because the record is insufficient to determine the intent of the parties.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, July 31, 2012.



     /S/ Leslie E. Kobayashi        
Leslie E. Kobayashi
United States District Judge

EVERGREEN ENGINEERING, INC. V. GREEN ENERGY TEAM LLC; CIVIL 10-00676 LEK-BMK; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT/COUNTERCLAIM PLAINTIFF GREEN ENERGY TEAM LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON (a) COUNT I (BREACH OF CONTRACT) OF PLAINTIFF EVERGREEN ENGINEERING, INC.'S FIRST AMENDED COMPLAINT AND (b) COUNT III (BREACH OF CONTRACT) OF GREEN ENERGY TEAM LLC'S COUNTERCLAIM